**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EVEREST INDEMNITY INSURANCE COMPANY,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 25 C 5488** |
| **KATES DETECTIVE & SECURITY SERVICES AGENCY, INC., et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Everest Indemnity Insurance Co. has sued Kates Detective & Security Services Agency, Inc. and the Chicago Housing Authority (CHA), seeking a declaratory judgment that it is not obligated to defend or indemnify Kates or CHA against an underlying wrongful death lawsuit. Everest and CHA have filed cross-motions for summary judgment. For the reasons below, the Court grants Everest's motion and denies CHA's motion.

**Background**

On February 14, 2022, CHA requested security services at "certain CHA office and administrative facilities and satellite locations." CHA Ex. 1 at 6.[1] Kates responded to that request the next month, and on August 30, 2022, CHA and Kates entered into an

---

[1] Pincites for exhibits are based on ECF pagination. Pincites for briefs are based on the pagination in the brief.

agreement for Kates to provide security services to CHA (the Security Services agreement).

Under the Security Services agreement, Kates agreed to "procure and maintain" certain kinds of insurance "in order to protect [CHA] against bodily injury or property damage claims which might arise from or in connection with services performed under" the agreement. *Id.* at 15. As relevant here, Kates had to maintain "General Liability" coverage "for bodily injury, personal, and property damage" and "Professional Liability (E & O) Insurance covering acts, errors, or omissions." *Id.* at 15–16.

Four months earlier, Kates had purchased an insurance policy from Everest for "Commercial General Liability Coverage" from May 1, 2022 to May 1, 2023. Everest Ex. 1 at 6, 8. Under that policy, Everest agreed to indemnify and defend Kates against lawsuits for "'bodily injury' or 'property damage' . . . caused by an 'occurrence,'" subject to additional policy requirements and exclusions. *Id.* at 14.

On October 13, 2023, Louis G. Apostol—the Illinois Public Administrator for Cook County—filed a wrongful death lawsuit in Illinois state court on behalf of Mae Brown's estate (the Apostol lawsuit), naming CHA and Kates as defendants. According to the Apostol complaint, CHA and Kates failed to provide adequate security at the CHA-owned Lincoln Perry Apartments, resulting in Mae Brown's death in October 2022. Specifically, the complaint alleges that Shearly Gaines entered Brown's apartment and threatened her; the Chicago Police Department advised CHA and Kates to prevent Gaines from entering the building again; and CHA and Kates failed to do so.

CHA tendered its defense of the lawsuit to Kates. Kates in turn tendered its defense to Everest under its insurance policy. Everest denied coverage and filed this

action seeking a declaratory judgment that it has no obligation to defend or indemnify CHA or Kates against the Apostol lawsuit.

## Discussion

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a movant must show that even after drawing all reasonable inferences from the record in favor of the nonmoving party, a reasonable trier of fact could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In this case, the parties agree on the relevant facts. Their dispute solely concerns the meaning of several provisions of the insurance policy. Under Illinois substantive law, which governs this diversity case, "the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *BASF AG v. Great Am. Assurance Co.*, 522 F.3d 813, 819 (7th Cir. 2008).

## A. Contract interpretation

Two lines of coverage in the policy are relevant in this case. The first line provides general liability coverage for "bodily injury" and "property damage" caused by an "occurrence," defined to mean "an accident." Everest Ex. 1 at 14, 27. The second line of coverage is added by an "Errors and Omissions [E&O] Liability Endorsement" and covers "negligent act[s], error[s] or omission[s]" that result in a "loss." *Id.* at 53. Loss is defined to mean "injury or damage *other than* 'bodily injury,' 'property damage' or 'personal and advertising injury.'" *Id.* at 56 (emphasis added). The parties do not dispute that the Apostol claim is one for "bodily injury."

3

1.      **General liability coverage**

The Apostol lawsuit is excluded from general liability coverage by the policy's Designated Operations endorsement.  That provision states in relevant part that the policy "does not apply to 'bodily injury' or 'property damage' arising out of [designated] operations," including "[a]ny and all work involving low income housing, government owned and/or subsidized housing, HUD housing, and Section 8 housing."  *Id.* at 59.  CHA and Kates do not dispute that the Apostol lawsuit is a claim for "bodily injury" or that the Lincoln Perry Apartments are "government owned . . . housing."  Thus the Apostol lawsuit falls squarely within the Designated Operations exclusion.

CHA resists this conclusion by contending that the terms "work," "operations," and "arising out of" are ambiguous.  Specifically, CHA asserts that "work" and "operations" do not clearly apply to their decision to hire Kates.  CHA accepts that "arising out of" refers to a causal requirement, but it argues that the Apostol lawsuit was not caused by or even related to the fact that the Lincoln Perry Apartments were government-owned.

Neither argument is persuasive.  First, CHA misreads the object of the "arising out of" requirement.  The Designated Operations exclusion applies to claims that "aris[e] out of the operations described."  *Id.*  The relevant operation is "*[a]ny and all work involving* . . . government owned . . . housing."  *Id.* (emphasis added).  Arising out of work involving government owned housing does not mean the same thing as arising out of the fact that housing is government owned.  The Apostol lawsuit straightforwardly arises out of conduct involving government owned housing.

That leaves the question of whether that conduct constitutes "work."  CHA

focuses on its hiring decision, perhaps because that is the subject of the legal claim for which CHA seeks coverage, but nothing in the Designated Operations exclusion says that it looks only to the conduct of the party seeking coverage. To the contrary, the exclusion expressly states that it applies "regardless of whether such operations are conducted by or on behalf of any insured." *Id.* That means that it excludes claims that arise out of conduct by others on the insured's behalf—like Kates's security services—if that conduct constitutes "work."

Moreover, CHA is not the named insured on the policy. CHA is covered only by virtue of an Additional Insured endorsement, which makes clear that an additional insured is limited to coverage for Kates's acts, not its own. The policy clarifies early on that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured," *i.e.*, Kates. *Id.* at 14. The Additional Insured endorsement states that an additional insured is covered for liability "only to the extent caused, in whole or in part, by *[y]our* acts or omissions; or [t]he acts or omissions of those acting on *your* behalf." *Id.* at 35 (emphasis added). To make things clearer, the Additional Insured endorsement goes on to say that "[t]his insurance does not apply to '[b]odily injury,' 'property damage' or 'personal and advertising injury' arising out of any act or omission *of an additional insured* or any of its employees." *Id.* (emphasis added).

What this means is that there is no coverage if Kates's security services are "work" within the meaning of the policy.[2] Whatever the term "work" might mean at the fringes, in this context, it readily includes Kates's security guard services on CHA's

---

[2] The term "operation" in the Designated Operations exclusion simply refers to the listed types of "work."

behalf.  *See, e.g.*, *Work*, Merriam-Webster, https://www.merriam-webster.com/dictionary/work (last visited Jan. 29, 2026) (defining the noun "work" as "activity that a person engages in regularly to earn a livelihood" or "a specific task, duty, function, or assignment often being a part or phase of some larger activity").

Kates tries a different angle, contending that the Designated Operations exclusion is ambiguous because it conflicts with other provisions of the insurance policy. Specifically, Kates asserts that it conflicts with an Insured Contract provision, which purports to cover liability "[a]ssumed in a[n] 'insured contract.'"  Everest Ex. 1 at 15.  The policy defines "insured contract" to include agreements "pertaining to [Kates's] business (including an indemnification of a municipality in connection with work performed for a municipality) under which [Kates] assume[d] the tort liability of another party."  *Id.* at 26. According to Kates, "the Policy nonsensically provides coverage for work performed on behalf of a municipality pursuant to a contract (Insured Contract), while simultaneously stating there is no coverage for work performed at a municipal building (Designated Operations Exclusion).  At best such Policy language is ambiguous."  Kates Resp. at 6–7.

Kates's argument rests on a misreading of the policy.  The Designated Operations exclusion does not exclude all work performed at municipally-owned buildings; the exclusion applies only to work involving government-owned *housing*.  As Everest points out, that leaves open plenty of other "work performed for a municipality" that the Insured Contract provision may cover.  And that would be true even on Kates's misreading:  work can be "performed for a municipality" without being at a "municipally-owned building."

That is a key point under Illinois law. The mere fact that an exclusion carves out some claims that otherwise would be covered is not enough to create ambiguity. Indeed, that is the very purpose of an exclusion. *Nat'l Fire Ins. Co. v. Visual Pak Co.*, 2023 IL App (1st) 221160, ¶ 93, 243 N.E.3d 888, 907. Rather, as discussed in more detail below, conflict between coverage and exclusion provisions creates ambiguity only where the exclusion would swallow or nullify the purported coverage. *Id.* ¶¶ 96–97, 243 N.E.3d at 907; *Citizens Ins. Co. of Am. v. Wynndalco Enters., LLC*, 70 F.4th 987, 995–96 (7th Cir. 2023). In that scenario, a court must consider whether it can "give effect to all provisions of the policy" by reading the exclusion to be "more narrow than its plain terms taken in isolation would otherwise suggest." *Wynndalco*, 70 F.4th at 996.

There is no such conflict here. The Designated Operations exclusion does not swallow or nullify the Insured Contract provision or any other coverage provision. The Court therefore has no basis to read the exclusion to be narrower than its plain terms. And by its plain terms, the Designated Operations exclusion precludes coverage for the Apostol lawsuit.

### 2. E&O coverage

The Apostol lawsuit is not covered by the E&O line of coverage either. The E&O endorsement excludes "bodily injury," and therefore the Apostol lawsuit, through the endorsement's definition of "loss." CHA does not contest this reading, but Kates does. According to Kates, the exclusions render the E&O endorsement illusory. Kates notes that the E&O exclusions preclude coverage for "bodily injury," "property damage," "Contractual Liability," and numerous other types of claims:

(1) Theft; (2) Claims or "suits" between insureds; (3) Warranty or guaranty;
(4) ERISA; (5) Statutory or regulatory liability; (6) Securities violation;

(7) Antitrust laws; (8) Other enterprises; (9) Injunctive relief; (10) Punitive damages, fines or penalties; (11) Medical or health care service; (12) Other services [other than security guard operations]; (13) Continuation of previously "manifested" acts, errors or omissions; (14) Prior or pending claims or "suits"; (15) Other insurance; (16) Failure to complete specifications; and (17) Licensed, registered or certified professionals.

Kates Resp. at 12; *see* Everest Ex. 1 at 54–55.

To be sure, these exclusions preclude a wide range of claims that the E&O endorsement otherwise would cover. That is especially true as a practical matter, considering that the insurance policy was designed to cover security services. *See Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 778 (7th Cir. 2015) (noting that under Illinois law, courts "must construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract" (quoting *Crum v. Forster Managers Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073, 1078 (1993)).

Everest, however, has identified that at least one type of claim would potentially be covered under the E&O endorsement: "a claim for alleged negligent security guard operations that caused a client to suffer business interruption and economic losses." Everest Reply at 11. The Court agrees that such a claim would not be excluded from E&O coverage, but it struggles to identify any other claims that could be covered. The question for the Court, then, is whether that narrow coverage is enough to save the E&O endorsement from being illusory or ambiguous, an issue that has generated some conflict between the Seventh Circuit and the Illinois Appellate Court.

In *Wynndalco*, the Seventh Circuit addressed whether a "catch-all provision" in an insurance policy exclusion applied to a violation of Illinois's Biometric Information Privacy Act (BIPA). *Wynndalco*, 70 F.4th at 989. The exclusion barred coverage for

8

claims arising out of three specified statutes. The catch-all provision further excluded claims arising out of "[a]ny other laws, statutes, ordinances, or regulations, that address, prohibit or limit the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information." *Id.* at 993.

The Seventh Circuit acknowledged that a "literal, plain-text reading of the catch-all provision would include BIPA violations." *Id.* at 997. It noted, however, that the policy purported to cover "personal and advertising injury," and all of the injuries included in the definition of that term were "subject to, or potentially subject to, statutory causes of action." *Id.* The Seventh Circuit recognized that a literal reading of the exclusion would not apply to common-law claims and thus "might not render the coverage promised earlier in the policy for 'personal and advertising injuries' *wholly* illusory." *Id.* at 998. But "certain categories of wrongs" that the policy expressly purported to cover—namely, intellectual property injuries—were "entirely statutory in nature." *Id.* at 999. The catch-all exclusion, if read literally, would "swallow" the policy's promise to cover those injuries. *Id.*

In the Seventh Circuit's view, this "conflict between . . . competing policy provisions granting and excluding coverage" rendered the catch-all provision ambiguous. *Id.* at 998. After reasoning that the catch-all provision could not be narrowed by canons of construction and thus was "intractably ambiguous," the Seventh Circuit, applying Illinois law, resolved that ambiguity in favor of the insured and held that the exclusion did not apply to a claim under BIPA. *Id.* at 1004–05.

Shortly after *Wynndalco* was decided, the Illinois Appellate Court reached the opposite conclusion, holding that a "nearly identical exclusion" "unambiguously

excluded" coverage for claims under BIPA. *Visual Pak*, 2023 IL App (1st) 221160, ¶¶ 44, 120, 243 N.E.3d at 897, 911. The state court expressly stated that it believed that the Seventh Circuit decision was wrongly decided, and it explained where it believed that the Seventh Circuit's analysis was flawed. *See id.* ¶ 2, 243 N.E.3d at 892–93. As relevant to this case, the state court cautioned that "the fact that an exclusion has a 'broad sweep' is not, in and of itself, a reason to deem the coverage 'illusory.'" *Id.* ¶ 84, 243 N.E.3d at 905. Rather, according to the state court, "[i]t is only when the exclusion has the effect of 'swallowing' the coverage *entirely* that the exclusion can be deemed illusory." *Id.*

Importantly, the state court acknowledged that the Seventh Circuit may have correctly applied this principle when it reasoned that the exclusion "might irreconcilably conflict with" the policy's purported coverage of intellectual property injuries. *Id.* ¶¶ 112, 114, 243 N.E.3d at 910–11. Instead, the state court's problem with that analysis was that intellectual property coverage under the policy was not implicated by BIPA. In its view, the Seventh Circuit erred by "nullify[ing] an entire coverage exclusion as illusory" based on "a hypothetical conflict in language that was not at issue before the court." *Id.* ¶ 116, 243 N.E.3d at 910–11.

Although the Seventh Circuit has twice noted the Illinois Appellate Court's disapproval in *Visual Pak*, it has not disavowed the reasoning in *Wynndalco*. *See Thermoflex Waukegan, LLC v. Mitsui Sumitomo Ins. USA, Inc.*, 102 F.4th 438, 441 (7th Cir. 2024); *Citizens Ins. Co. of Am. v. Mullins Food Prods., Inc.*, 135 F.4th 1082, 1092 (7th Cir. 2025). And to the extent that *Wynndalco* and *Visual Pak* conflict, this Court is required to follow the Seventh Circuit's view in *Wynndalco* until it is overruled by the

10

Seventh Circuit, the Illinois Supreme Court, or the United States Supreme Court. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004); *see also H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 634 (7th Cir. 2020).

In any event, this Court does not view the points of disagreement in *Visual Pak* to alter the outcome in this case. The key reasoning in *Wynndalco* was that a literal reading of the exclusion would wholly swallow, or completely nullify, another part of the policy purporting to cover intellectual property injuries. Though the state court disagreed with the Seventh Circuit's choice to analyze provisions not directly at issue, it did not disagree with the substance of the Seventh Circuit's analysis of those provisions. Viewing that analysis as the dispositive point, this Court reads *Wynndalco* to be consistent with the principle stated in *Visual Pak* that an exclusion renders a coverage provision illusory—and thus renders the exclusion ambiguous—only if the exclusion would wholly swallow the coverage.

Measured against that standard, the E&O endorsement in this case is not illusory. The exclusions in the policy significantly narrow but do not wholly swallow the E&O coverage. Put differently, the E&O endorsement still provides coverage against some possible liability. That is enough for it not to be illusory. *See Visual Pak*, 2023 IL App (1st) 221160, ¶¶ 93–108, 243 N.E.3d at 907–10; *Wynndalco*, 70 F.4th at 998 (acknowledging that an exclusion that left some coverage intact would not render that coverage provision wholly illusory).

As with the general liability coverage, Kates also argues that the E&O endorsement conflicts with the Insured Contract provision. Insured contract coverage applies to agreements "under which [Kates] assume[d] the tort liability of another party."

11

Everest Ex. 1 at 26.  "Tort liability" is defined as "liability that would be imposed by law in the absence of any contract or agreement."  *Id.*  Kates contends that coverage is nullified by the E&O endorsement's exclusion for "[c]ontractual [l]iability," which precludes coverage for "[d]amages which the insured is obligated to pay by reason of the assumption of liability in a contract or agreement."  *Id.* at 53–54.

The very next paragraph, however, states that "[t]his exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement," *i.e.*, tort liability.  *Id.* at 54.  That resolves any apparent conflict that might otherwise exist between the Insured Contract provision and the E&O contractual liability exclusion.  The Insured Contract provision provides coverage for tort liability.  The E&O endorsement precludes coverage for contractual liability but leaves intact coverage for tort liability.  Tort liability is covered; contractual liability is not.  The provisions are not inconsistent.

Moreover, these provisions likely do not intersect in the first place.  The E&O contractual liability exclusion states that it is "delet[ing] and replac[ing]" the provision providing coverage for "insured contracts" (at least "[f]or the purposes of insurance provided by [the E&O] endorsement").  *Id.* at 53.  In other words, the provision that, in the first instance, purports to cover insured contract liability does not apply to E&O coverage.

To summarize, neither of Kates's arguments persuade the Court to read the E&O exclusions to be narrower than their plain text.  Unlike in *Wynndalco*, a plain-text reading of the E&O exclusions does not completely nullify the E&O provision or any other coverage provision.  And Kates has proposed no other basis aside from its

12

illusoriness argument to read the exclusions other than how they are written. It may be that the resulting coverage ends up being narrower than Kates planned to obtain or that CHA was expecting, but unfulfilled expectations are not a basis to expand coverage beyond the terms of the policy that Everest issued.

In any event, Kates's illusoriness argument would only get it so far. If the E&O exclusions rendered the E&O coverage illusory or otherwise created ambiguity, the Court would resolve that ambiguity in Kates's favor as the insured. *Wynndalco*, 70 F.4th at 1004. In other words, the Court would interpret the E&O endorsement to apply to the Apostol lawsuit, notwithstanding the exclusion for bodily injury. But resolving that ambiguity in Kates's favor does not mean rewriting the rest of the policy. The Designated Operations exclusion, as analyzed above, would still be unambiguous and preclude coverage.

Read literally, the E&O endorsement and the Designated Operations exclusion do not intersect. Even though the Designated Operations exclusion and the E&O endorsement state that they are modifying insurance provided under the same "COMMERCIAL GENERAL LIABILITY COVERAGE PART," the E&O endorsement does not cover "bodily injury" and "property damage," whereas the Designated Operations exclusion narrows coverage only for those kinds of claims. *See* Everest Ex. 1 at 53, 59. The E&O exclusion for "bodily injury" keeps the two provisions apart. If that exclusion were read out, then the Designated Operations exclusion would apply to E&O coverage. And the Apostol lawsuit would still be a claim for bodily injury arising out of work involving government-owned housing. As a result, coverage would still ultimately be precluded under the Designated Operations exclusion.

The Court therefore concludes that the Apostol lawsuit is not covered under the E&O endorsement.

### 3.      CHA's additional insured coverage

The parties also dispute the extent of CHA's coverage as an additional insured. Everest points out that its insurance obligations to CHA, which is not a named policyholder, are defined by an endorsement titled "Additional Insured – Owners, Lessees or Contractors – Automatic Status When Required in Agreement With You." *Id*. at 35.  That provision "include[s] as an additional insured any . . . organization for whom [Kates] perform[ed] operations when [Kates] and such . . . organization have agreed in writing . . . that such . . . organization be added as an additional insured on [Kates's] policy." *Id*.  The parties agree that CHA qualifies as an additional insured under this policy by virtue of the Security Services agreement.

The next part defines the scope of coverage that an additional insured receives under the policy.  It states that "[t]he insurance afforded to an additional insured shall only include the insurance required by the terms of the written agreement and shall not be broader than the coverage provided within the terms of the Coverage Part." *Id*. Everest asserts that this means that CHA's coverage under the insurance policy is limited to the insurance that Kates was required to get under its Security Services agreement with CHA.  And in Everest's view, CHA's coverage as an additional insured is subject to the same exclusions and limitations that apply to Kates.  Kates and CHA do not dispute these premises.

Based on the terms of the Security Services agreement, Everest argues that "Kates agreed . . . to include the CHA as an additional insured for general liability

insurance only, not E&O insurance."  Everest Mot. for Summ. J. at 11.  Kates disagrees, citing language in the security services agreement stating, "Additional Insured status shall apply to all liability policies, with the exception of Professional Liability and Workers Compensation."  Kates Resp. at 15 (quoting CHA Ex. 1 at 16).  Similarly, the agreement required that "CHA shall be included as an additional insured" regarding general liability insurance but omitted an additional insured requirement for "Professional Liability" insurance.  CHA Ex. 1 at 16.  What Kates apparently misses is that the Security Services agreement uses the term Professional Liability insurance as a synonym for E&O insurance.  *See id.* (requiring Kates to procure "Professional Liability (E & O) Insurance covering acts, errors, or omissions").  The language that Kates relies on defeats its own contention.  In the Security Services agreement, CHA did not require Kates to obtain E&O coverage, and (perhaps as a result) CHA is not an additional insured for E&O coverage under the Additional Insured provision.

In any event, the Additional Insured endorsement does not expand the policy's coverage to additional types of claims.  Rather, as the parties seem to agree, it simply adds CHA to the policy's existing coverage.  And as discussed above, the policy does not cover the Apostol lawsuit.  Accordingly, even if CHA were an additional insured for both general liability and E&O coverage, it would not be entitled to coverage for the Apostol lawsuit.

## B.    Discovery and duty to defend

Kates and CHA pair their textual arguments with two other contentions, but neither overcomes the plain meaning of the policy terms.  Kates tries to escape the four corners of the policy by seeking additional discovery into what Everest knew when it

15

created the policy, what Everest understood the exclusions in the policy to mean, and how much Kates paid to add E&O coverage.  Kates, however, does not assert that this evidence will show fraud or another defense to enforceability.  It instead claims that this discovery will show that the policy is illusory or ambiguous.

Under Illinois law, extrinsic evidence is admissible to clarify a textual ambiguity, but it generally cannot inject ambiguity into otherwise clear language.  *See, e.g.*, *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*, 794 F.3d 666, 673 (7th Cir. 2015) (citing *Air Safety, Inc. v. Tchrs. Realty Corp.*, 185 Ill. 2d 457, 464, 706 N.E.2d 882, 885 (1999)).  Some Illinois appellate decisions have departed from this four-corners rule if a "provisional" review of objective, extrinsic evidence shows that, in context, a facially unambiguous contract "actually means something other than what it seems to mean."  *Air Safety*, 185 Ill. 2d at 463, 706 N.E.2d at 885 (quoting *Ahsan v. Eagle, Inc.*, 287 Ill. App. 3d 788, 790, 678 N.E.2d 1238, 1241 (1997)).  The Illinois Supreme Court, however, has rejected this "provisional admission" approach for contracts containing express integration clauses.  *Air Safety*, 185 Ill.2d at 464, 706 N.E.2d at 885.

The insurance policy in this case contains such an integration clause, which states:  "THIS COMMON POLICY DECLARATION[] AND THE SUPPLEMENTAL DECLARATION(S), TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART(S), COVERAGE FORM(S), AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED POLICY."  Everest Ex. 1 at 2.  As a result, whatever Everest knew when it created the policy would not change the Court's conclusion that the policy unambiguously bars coverage.  *See Davis v. G.N. Mortg.*

16

*Corp.*, 396 F.3d 869, 879 (7th Cir. 2005).  The Court thus concludes that no additional discovery is necessary or appropriate to resolve this case.

Finally, Kates and CHA emphasize that the duty to defend under Illinois law is broad:  if the facts alleged in the complaint potentially fall within the scope of the policy, the insurer must provide a defense.  *See, e.g.*, *Wynndalco*, 70 F.4th at 995; *Visual Pak*, 2023 IL App (1st) 221160 at ¶ 30, 243 N.E.3d at 895.  That is true, but it does not help Kates or CHA here.  The Apostol complaint unambiguously alleges bodily injury, precluding E&O coverage.  And it unambiguously alleges that the injury arose out of Kates's security services work at a government-owned building, triggering the Designated Operations exclusion.  Under any reading of the Apostol complaint, the claim is barred from coverage.

In conclusion, Everest is not obligated under its insurance policy to defend or indemnify Kates or CHA for the Apostol lawsuit.

## Conclusion

For the reasons stated above, the Court grants Everest's motion for summary judgment [dkt. 57] and denies CHA's cross-motion for summary judgment [dkt. 71].  The parties are directed to prepare a proposed form of judgment consistent with this ruling and are to provide a Word version to the undersigned judge's proposed order e-mail address by February 23, 2026.  In addition, the parties are directed to file a joint status report on February 24, 2026 stating their views regarding how to proceed with the three related cases in light of the Court's ruling here.  The telephonic status hearing set for February 19, 2026 is vacated and reset to February 26, 2026 at 9:15 a.m., using call-in

number 650-479-3207, access code 2305-915-8729.

MATTHEW F. KENNELLY
United States District Judge

Date:  February 18, 2025